Chief Justice MARTIN dissenting.
**328 Defendant beat and abducted his wife, Maria Rodriguez, before strangling her to death. After defendant strangled Maria, he decapitated her and hid her head and the rest of her body in two separate places. Maria's skull was not found for two and a half years.
A Forsyth County jury unanimously sentenced defendant to death for this premeditated and deliberate murder. Rather than respecting the jury's carefully considered sentencing verdict, the majority tries mightily to apply the facts of this case to the statutory mitigating circumstance found in N.C.G.S. § 15A-2000(f)(6). In doing so, the majority overlooks the complete lack of evidence linking defendant's purported intellectual *34 impairment, mental disorders, and marital strife to his homicidal conduct. The majority also ignores the evidence showing that defendant's actions were carefully premeditated and that he took many steps to conceal his identity as the perpetrator, evidence that would clearly prevent any reasonable juror from finding the existence of the (f)(6) mitigating circumstance. For those reasons, the majority's holding is unsupported by the relevant sentencing statute and is inconsistent with the vast majority of our decisions interpreting it. I therefore respectfully dissent.
During the sentencing phase of a capital case, the trial court must submit a statutory mitigating circumstance to the jury if the defendant has presented "substantial evidence" of that circumstance. State v. Watts , 357 N.C. 366, 377, 584 S.E.2d 740, 748 (2003) (quoting State v. Fletcher , 354 N.C. 455, 477, 555 S.E.2d 534, 547 (2001), cert. denied , 537 U.S. 846, 123 S.Ct. 184, 154 L.Ed.2d 73 (2002) ), cert. denied , 541 U.S. 944, 124 S.Ct. 1673, 158 L.Ed.2d 370 (2004). Evidence of a statutory mitigating circumstance is "substantial" only if "a juror could reasonably find that the circumstance exists based on the evidence." Id. (quoting State v. Kemmerlin , 356 N.C. 446, 478, 573 S.E.2d 870, 892 (2002) ). The burden of producing substantial evidence to support the submission of a mitigating circumstance rests with the defendant. Id.
The (f)(6) mitigating circumstance states: "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(6) (2017). It therefore "embraces two types of disability, one diminishing a person's ability to appreciate the criminal nature of his conduct, and the other diminishing a person's ability to control himself." State v. Price , 331 N.C. 620, 630-31, 418 S.E.2d 169, 175 (1992), judgment vacated on other grounds , 506 U.S. 1043, 113 S.Ct. 955, 122 L.Ed.2d 113 (1993). But in both of these instances, a defendant must produce evidence that **329 his capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired ." N.C.G.S. § 15A-2000(f)(6) (emphasis added). In other words, the (f)(6) mitigating circumstance does not encompass every instance in which a defendant presents evidence of an intellectual impairment or mental disorder. See State v. Syriani , 333 N.C. 350, 395, 428 S.E.2d 118, 142-43 ("[The (f)(6) mitigating] circumstance has only been found to be supported in cases where there was evidence, expert or lay, of some mental disorder, disease, or defect, ... to the degree that it affected the defendant's ability to understand and control his actions ." (emphasis added)), cert. denied , 510 U.S. 948, 114 S.Ct. 392, 126 L.Ed.2d 341 (1993). Instead, a defendant's intellectual impairment or mental disorder must have actually impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law-and the burden is on the defendant to produce evidence establishing this link.
Even assuming for the sake of argument that defendant did, in fact, have an intellectual impairment, as well as two mental disorders (namely, posttraumatic stress disorder and chronic depression), and that he was experiencing marital problems with Maria at the time of the murder, the mere presence of those conditions, without more, does not require submission of the (f)(6) mitigating circumstance. See id. Despite the clear requirement to do so, defendant did not present any evidence demonstrating a link between those conditions, on the one hand, and his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, on the other. To support its conclusion that the trial court should have submitted the (f)(6) mitigating circumstance, the majority conspicuously forgoes any substantive analysis of how or to what extent defendant's purported intellectual impairment, mental disorders, or marital strife affected his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. And this is for good reason: the record contains no evidence that would support an analysis linking defendant's purported conditions to his homicidal conduct.
At trial, Judge Albright recognized the evidentiary inadequacy of defendant's request *35 for submission of the (f)(6) mitigating circumstance, noting that defendant had failed to present "any testimony to support" that instruction. Despite Judge Albright's astute handling of this issue, the majority tries to justify its holding by pointing to the testimony of Dr. Antonio Puente, one of defendant's expert witnesses, who testified that defendant had a very poor ability to "reason and think." But this testimony, without more, does not show that defendant's ability **330 to appreciate the criminality of his conduct was impaired. Nor does this testimony, without more, suggest that defendant had an impaired ability to conform his conduct to the requirements of the law. Poor reasoning skills do not necessarily impair one's ability to control his actions or to know what the law requires. Requiring the submission of the (f)(6) mitigating circumstance in every instance in which a defendant has poor reasoning skills, moreover, would likely mean that the mitigating circumstance would need to be submitted in every case in which the defendant has an intellectual impairment-an approach that this Court has clearly rejected and that would be inconsistent with the limits that the statutory text of subsection (f)(6) itself imposes.
Notably, the only testimony directly relating to defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law weighs in favor of the trial court's decision not to submit the (f)(6) mitigating circumstance to the jury. Dr. Selena Sermeño, another one of defendant's experts, testified that defendant generally seemed to be able to discern right from wrong. This was evident, Dr. Sermeño testified, by defendant's refusal to accept a gun that a soldier offered to him during the El Salvadorian civil war, when defendant was eleven years old. This testimony likely would not, by itself, be enough to foreclose submission of the (f)(6) mitigating circumstance to the jury, see State v. Johnson , 298 N.C. 47, 68, 257 S.E.2d 597, 613 (1979), at least when a defendant shows a causal nexus between his intellectual impairment and his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. But here, as the trial court recognized, defendant did not present evidence linking his purported intellectual impairment to his homicidal conduct.
Defendant similarly failed to present any evidence that linked his alleged posttraumatic stress disorder to his homicidal conduct. Two of defendant's own experts-Dr. Sermeño and Dr. Moira Artigues-testified that defendant's posttraumatic stress disorder did not manifest itself through irritability or violent outbursts. Rather, it manifested itself through defendant's impaired ability to express strong emotions verbally or through body language, as well as poor sleep, flashbacks, difficulty with smells and sudden noises, and difficulty with memories. None of these symptoms have anything to do with defendant's ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. And the record is similarly devoid of any explanation as to how defendant's ongoing marital problems or purported chronic depression impaired his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
**331 Because evidence of any of these links was lacking, a jury would have had to go beyond the evidence presented and speculate in order to conclude that the (f)(6) mitigating circumstance may have applied here. And when the evidence is such that a jury would have to base its finding of a mitigating circumstance "solely upon speculation and conjecture, not upon substantial evidence," submission of the instruction to the jury is "unreasonable as a matter of law." State v. Anderson , 350 N.C. 152, 183, 513 S.E.2d 296, 315 (quoting State v. Daniels , 337 N.C. 243, 273, 446 S.E.2d 298, 316-17 (1994), cert. denied , 513 U.S. 1135, 115 S.Ct. 953, 130 L.Ed.2d 895 (1995) ), cert. denied , 528 U.S. 973, 120 S.Ct. 417, 145 L.Ed.2d 326 (1999).
Even assuming for the sake of argument that defendant had produced evidence linking his purported intellectual impairment, mental disorders, and marital problems to his homicidal conduct, the record contains ample evidence that would rebut any reasonable inference that defendant had an impaired ability to appreciate the criminality of his *36 conduct or conform his conduct to the requirements of the law. As noted earlier, a statutory mitigating circumstance must be submitted only if a juror could reasonably find its existence based on the evidence. Watts , 357 N.C. at 377, 584 S.E.2d at 748 (quoting Kemmerlin , 356 N.C. at 478, 573 S.E.2d at 892 ). The majority correctly recites this standard but then misapplies it. Although the majority's analysis seems to suggest otherwise, nowhere in our precedents have we required our trial courts to view all evidence pertaining to the submission of the (f)(6) mitigating circumstance in the light most favorable to the defendant, resolving ambiguities and inconsistencies in his favor. And we have never, until today, directed our trial courts to ignore the presence of overwhelming evidence that refutes any suggestion that a defendant had an impaired capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law.
In fact, our precedents clearly show the opposite. We have repeatedly recognized that a trial court may, in its determination of whether to submit the (f)(6) mitigating circumstance, consider evidence rebutting a defendant's argument that the instruction should be submitted to the jury. For instance, we have held that a trial court properly did not submit the (f)(6) mitigating circumstance when a defendant's academic performance and operation of a gambling business while in prison were inconsistent with his argument that he had an impaired ability to "understand and control his actions." State v. Braxton , 352 N.C. 158, 215, 531 S.E.2d 428, 461 (2000), cert. denied , 531 U.S. 1130, 121 S.Ct. 890, 148 L.Ed.2d 797 (2001) ; see also State v. Strickland , 346 N.C. 443, 464, 488 S.E.2d 194, 206 (1997) ("There was no evidence that consumption of this alcohol so impaired **332 defendant as to ... affect[ ] his ability to control his actions. In fact, there was direct evidence to the contrary."), cert. denied , 522 U.S. 1078, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998).
In a line of recent cases, this Court has placed particular emphasis on whether a defendant's acts "demonstrate that [he] was aware that his acts were criminal," therefore negating any suggestion that the defendant's capacity to appreciate the criminality of his conduct was impaired. See State v. Polke , 361 N.C. 65, 72, 638 S.E.2d 189, 194 (2006), cert. denied , 552 U.S. 836, 128 S.Ct. 70, 169 L.Ed.2d 55 (2007). For instance, we have held that the trial court properly declined to submit the (f)(6) mitigating circumstance to the jury when the evidence showed that the defendant lured the victim to the scene of the murder, disposed of the murder weapon, and had false identification when he was apprehended. State v. Gainey , 355 N.C. 73, 104, 558 S.E.2d 463, 483, cert. denied , 537 U.S. 896, 123 S.Ct. 182, 154 L.Ed.2d 165 (2002). Based on this evidence, the Court reasoned that the defendant "fully underst[ood] that his acts were criminal." Id. at 104, 558 S.E.2d at 483. In another case, this Court held that the trial court properly did not submit the (f)(6) mitigating circumstance when a "defendant's initial lies to police about his involvement in the murder and his washing and disposal of the murder weapon ... tend[ed] to show that [the] defendant fully appreciated the criminality of his conduct." State v. Badgett , 361 N.C. 234, 258, 644 S.E.2d 206, 220 (citing State v. Golphin , 352 N.C. 364, 476, 533 S.E.2d 168, 240 (2000), cert. denied , 532 U.S. 931, 121 S.Ct. 1380, 149 L.Ed.2d 305 (2001) ), cert. denied , 552 U.S. 997, 128 S.Ct. 502, 169 L.Ed.2d 351 (2007).
Here, defendant's conduct surrounding the murder of Maria demonstrates that he had a full grasp of the gravity and criminality of his actions. And this same evidence showing a careful, deliberate course of action indicates that defendant's mental faculties were not impaired during the course of the murder. While the majority recognizes the brutal nature of this murder, it utterly fails to recognize the legal significance of all of the preemptive steps that defendant took to conceal his identity as the perpetrator.
Defendant's actions when he came to Maria's apartment shortly before the murder provide ample evidence of defendant's meticulous attempts to conceal his crime. When defendant started arguing with Maria inside her bedroom and Maria called for help, the children found that the bedroom door was closed and locked. He also told the children *37 not to call the police and took Maria's cell phone away so that they could not call for help after he assaulted their mother. After ending the argument with Maria by incapacitating her, defendant transported Maria **333 from the apartment to his car by carrying her over his shoulder, all the while covering her face with her work uniform so that the children could not see the condition of their mother's face. At that time, defendant told the children that Maria had hurt herself on some furniture and that he was going to take her to the hospital. He told a concerned neighbor a similar story and added that the children were not allowed to visit Maria.
Defendant, moreover, took a number of additional steps to avoid being identified as the perpetrator. For instance, defendant returned to Maria's apartment and attempted to clean up a pool of Maria's blood that had soaked into the carpet. He lied to their children, to his friend, and to investigating officers about what had happened during his encounter with Maria in the bedroom. Soon after the murder, when defendant was with the children, one of them attempted to check the trunk of defendant's car to see if Maria was there. When that child saw Maria's work uniform in defendant's trunk, defendant quickly ran over and closed the trunk to try to prevent his children from investigating further. Defendant told his children that Maria's uniform was there because the doctor had given it to him. The evidence also suggests that defendant sent three text messages from Maria's cell phone trying to convince one of Maria's friends that she had run away with a new boyfriend to Spain.
Most notably, however, defendant severed Maria's head from her body after the murder and hid Maria's remains in two separate, heavily wooded areas. Maria's skull was not found for another two and a half years after the rest of her body was discovered. The authorities never recovered Maria's phone, the clothing that she wore on the night of the murder, or the object used to remove her head, suggesting that defendant carefully hid them in his effort to thwart a future prosecution.
Defendant's actions before, during, and after the murder indicate careful deliberation and an attempt to evade punishment, rebutting any reasonable inference that defendant had an impaired capacity to appreciate the criminality of his conduct. And these same actions-especially those leading up to the murder-bear no resemblance to the frenzied, hectic behavior expected of a person with an impaired capacity to conform his conduct to the requirements of the law. Nor are they consistent with a "child-like thought process[ ]" or a "limited ability to think and reason beyond the immediate moment," as defendant argues. And despite what the majority suggests, defendant's actions demonstrate far, far more than a mere "recognition of the wrongfulness of his conduct."
Rather than acknowledging the legal significance of defendant's acts surrounding the murder and the lack of evidence linking defendant's **334 purported mental conditions to his homicidal conduct, the majority instead focuses its analysis on two cases that are inconsistent with the language of the (f)(6) mitigating circumstance, and which, as a result, have become outliers in our jurisprudence. Specifically, the majority rests the crux of its argument on State v. Stokes , 308 N.C. 634, 304 S.E.2d 184 (1983), and State v. Fullwood , 329 N.C. 233, 404 S.E.2d 842 (1991), which, according to the majority, dispel any requirement that a defendant present evidence of a nexus between a defendant's mental condition and the defendant's homicidal conduct.
To begin with, it is worth noting that Stokes and Fullwood are inconsistent with cases that were decided before they were. In State v. Goodman , 298 N.C. 1, 257 S.E.2d 569 (1979), this Court held that if a defendant was intoxicated at the time of the murder, but not to a degree that his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired, the (f)(6) mitigating circumstance should not be submitted to the jury. Id. at 32-33, 257 S.E.2d at 589. This Court reaffirmed that principle in a similar case decided three years later, State v. Williams , 305 N.C. 656, 292 S.E.2d 243, cert. denied , 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982). In Williams , this Court held that evidence showing that the defendant drank alcohol on the night of a murder, *38 without evidence showing "that [the defendant's] capacity to appreciate the criminality of his conduct was impaired by [that] alcohol," was insufficient to support submission of the (f)(6) mitigating circumstance. Id. at 687, 292 S.E.2d at 262. These cases show that a defendant must present evidence of a link to require submission of the (f)(6) factor to a jury and therefore show that Stokes and Fullwood have been outliers in our jurisprudence ever since they were decided.
More recent cases, moreover, have implicitly overruled Stokes and Fullwood (or, alternatively, have confirmed that they were wrongly decided under preexisting caselaw when they were handed down). In State v. Hill , 347 N.C. 275, 493 S.E.2d 264 (1997), cert. denied , 523 U.S. 1142, 118 S.Ct. 1850, 140 L.Ed.2d 1099 (1998), we considered a case in which the defendant exhibited personality traits of "emotional and social alienation," "mild depression," "poor impulse control," and "subaverage intelligence." Id. at 301-02, 493 S.E.2d at 279. But we held that the trial court was correct not to submit the (f)(6) mitigating circumstance to the jury because "the testimony did not establish that [the] defendant's personality characteristics affected his ability to understand and control his actions ." Id. at 302, 493 S.E.2d at 280 (emphases added). Similarly, in State v. Gainey , expert testimony established that the defendant suffered from "moderately severe to severe mixed personality disorder ..., with paranoid and **335 schizoid features which tended to make him restless and impulsive." 355 N.C. at 103-04, 558 S.E.2d at 483. But, consistent with our holding in Hill , we held that this testimony, standing alone, did not amount to evidence that the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired. See id.
The list goes on. In State v. Kemmerlin , the defendant presented evidence that she had "borderline personality disorder" and "major depressive disorder." 356 N.C. at 480, 573 S.E.2d at 893. The defendant was additionally concerned that her stepson was going to sexually abuse her daughter, and, because of the defendant's own experiences suffering sexual abuse, she was "exquisitely and overly attuned to sexual issues." Id. at 479, 573 S.E.2d at 893. But this evidence was insufficient to support submission of the (f)(6) mitigating circumstance to the jury because the defendant's suffering, according to her own expert witness, "was not to the level of impairing her ability to appreciate the wrongfulness" of her conduct. Id. at 481, 573 S.E.2d at 893.
To highlight the distinction between this case and cases in which the trial court properly instructed the jury on the (f)(6) mitigating circumstance, we need to look no further than the majority's own citations. In State v. Hooks , 353 N.C. 629, 548 S.E.2d 501 (2001), cert. denied , 534 U.S. 1155, 122 S.Ct. 1126, 151 L.Ed.2d 1018 (2002), the defendant suffered from chronic substance abuse and underdeveloped skills for "emotional expression, social connection, and adult functioning." Id. at 640, 548 S.E.2d at 509. Although it was not squarely reviewing the propriety of the trial court's submission of the (f)(6) mitigating circumstance,[1] this Court emphasized the testimony of the defendant's expert witness: "[The defendant's] substance dependence and the impoverished skills for adult functioning combined such that his ability to think through his behavior , to consider the consequences of his actions , to reasonably plan or to understand and appreciate the connection between his actions and consequent events would have been impaired at the time of the offense." Id. (emphases added). In other words, as this Court recognized, the evidence indicated **336 much more than the mere presence of a mental impairment ; rather, expert testimony directly established a nexus between the defendant's *39 impairments and how they manifested themselves, and therefore, a jury could find that the defendant was not able to fully appreciate the criminality of his conduct. See id.
As this Court has repeatedly recognized, then, evidence that a defendant merely has an intellectual impairment or mental disorder is not enough to require the trial court to submit the (f)(6) mitigating circumstance to the jury. Instead, the defendant has the burden of linking his intellectual impairment or mental disorder to his homicidal conduct. If a defendant does not produce evidence of this link, the jury will not be able to infer the presence of the (f)(6) mitigating circumstance. When it cannot, the trial court should not submit that instruction to it.
In sum, the language of the (f)(6) mitigating circumstance and the weight of this Court's caselaw interpreting that statutory provision require a causal nexus between a defendant's mental condition and his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. Here, defendant presented no evidence of any such link. And by selectively relying on Stokes and Fullwood -which are clear outliers in our jurisprudence-the majority is dictating a change in law that has been relatively well settled for decades. See Payne v. Tennessee , 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991) (noting that the "consistent development of legal principles ... contributes to the actual and perceived integrity of the judicial process"). In any event, defendant's conduct surrounding the murder dispels any doubt that defendant freely chose not to conform his conduct to the law and fully appreciated the criminality of his conduct. I therefore respectfully dissent.
Justice NEWBY joins in this dissenting opinion.

The discussion of the (f)(6) mitigating circumstance in Hooks was dictum; the Court discussed the (f)(6) mitigating circumstance, which the trial court did submit to the jury, only to contrast the trial court's decision not to submit a different mitigating circumstance. Id. at 639-41, 548 S.E.2d at 508-09. Even though the Court's discussion of the (f)(6) mitigating circumstance was brief and not directly relevant to its holding, however, it is still helpful to show how the defendant in that case presented evidence linking his mental conditions to his homicidal conduct-which therefore justified the trial court's submission of the (f)(6) mitigating circumstance to the jury.